UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAMAZAN HAJDINI,<br><br>                 Plaintiff,<br><br>    -against-<br><br>SUNESIS PHARMACEUTICALS, INC.,<br>JAMES W. YOUNG, STEVE R.<br>CARCHEDI, PARVINDER S. HYARE,<br>STEVEN B. KETCHUM, DAYTON<br>MISFELDT, NICOLE ONETTO, HOMER L.<br>PEARCE, DAVID C. STUMP, and H.<br>WARD WOLFF,<br><br>            Defendants. | Case No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Ramazan Hajdini ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Sunesis Pharmaceuticals, Inc. ("Sunesis" or the "Company"), the members of Sunesis' board of directors (the "Board"), the Company's Interim Chief Executive Officer, Parvinder S. Hyare, (collectively with the Board, the "Individual Defendants" and together with Sunesis, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the proposed merger between Sunesis and Viracta Therapeutics, Inc. ("Viracta") (the "Proposed Merger"). Plaintiff also asserts a claim against the Individual Defendants for breaching their fiduciary duty of candor/disclosure under state law.

2.      On November 29, 2020, Sunesis and Viracta entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which each share of Viracta common stock will be converted into the right to receive 0.4034 shares of Sunesis common stock, for a total of 119,252 704 shares, subject to adjustment for the reverse stock split of Sunesis stock to be implemented prior to the consummation of the Proposed Merger (the "Merger Consideration"). Upon completion of the Proposed Merger, former Viracta equity holders will own approximately 86% and former Sunesis stockholders will own approximately 14% of the outstanding shares of common stock of the post-merger Combined Company. The Combined Company will be renamed Viracta Therapeutics, Inc. and its stock will move from trading on the Nasdaq Capital Market under the symbol "SNSS" to trading on the Nasdaq Global Market under the symbol "VIRX".

3.      On January 13, 2021, in order to solicit Sunesis shareholders to vote in favor of the Proposed Merger, Defendants authorized the filing of a materially incomplete and misleading proxy statement/prospectus/information statement on Form S-4 (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act and in breach of the Individual Defendants' duty of disclosure.

4.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Sunesis and Viracta; (ii) the valuation analyses performed by Sunesis' financial advisor, MTS Securities, LLC ("MTS"), in support of its fairness opinion; and (iii) the sales process leading up to the Proposed Merger.

5.      The special meeting of Sunesis shareholders to vote on the Proposed Merger is currently scheduled for February 22, 2021 (the "Shareholder Vote").  It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote so Plaintiff can make an informed decision on the Proposed Merger and properly exercise

his corporate suffrage rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and breach of the duty of candor/disclosure.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Merger until the material information discussed herein is disclosed to Sunesis' shareholders sufficiently in advance of the Shareholder Vote or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act and breach of the duty of candor/disclosure.

## JURISDICTION AND VENUE

7.       This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

8.      The Court has supplemental jurisdiction over the state law claim for breach of the duty of candor/disclosure pursuant to 28 U.S.C. § 1367.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman* 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the

defendant in any federal district court." *Id.* At 1316.

10.      Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Sunesis' common stock trades on The Nasdaq Capital Market, which is headquartered in this District rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.      Plaintiff is, and at all relevant times has been, a shareholder of Sunesis.

12.      Defendant Sunesis is biopharmaceutical company focused on the development of novel targeted inhibitors for the treatment of hematologic and solid cancers. Sunesis is a Delaware corporation and its common stock trades on the Nasdaq under the ticker symbol "SNSS."

13.      Individual Defendant James W. Young is, and has been at all relevant times, the Chairman of the Board of the directors of Sunesis. Individual Defendant Young signed the Proxy.

14.      Individual Defendant Steve R. Carchedi is, and has been at all relevant times, a director of Sunesis. Individual Defendant Carchedi signed the Proxy.

15.      Individual Defendant Parvinder S. Hyare is the current Interim Chief Executive Officer of Sunesis. Individual Defendant Hyare signed the Proxy and is listed as the *Attorney-in-Fact* and signatory of the Proxy.

16.      Individual Defendant Steven B. Ketchum is, and has been at all relevant times, a director of Sunesis. Individual Defendant Ketchum signed the Proxy.

17.      Individual Defendant Dayton Misfeldt was a director and the Chief Executive Officer of Sunesis during the all relevant times through the execution of the Merger Agreement and dissemination of the preliminary S-4 proxy statement on December 22, 2020. On December

16, 2020, Individual Defendant Misfeldt tendered his resignation as CEO and director of Sunesis, effective as of December 31, 2020, and agreed to remain as a consultant to the Company through the closing of the Proposed Merger.  Individual Defendant Misfeldt also signed the preliminary S-4 proxy statement as the CEO of the Company, was the signatory of the Merger Agreement as the CEO of the Company, and is listed as the point of contact for the company in the Merger agreement included in the Proxy.

18.     Individual Defendant Nicole Onetto is, and has been at all relevant times, a director of Sunesis. Individual Defendant Onetto signed the Proxy.

19.     Individual Defendant Homer L. Pearce is, and has been at all relevant times, a director of Sunesis. Individual Defendant Pearce signed the Proxy.

20.     Individual Defendant David C. Stump is, and has been at all relevant times, a director of Sunesis. Individual Defendant Stump signed the Proxy.

21.     Individual Defendant H. Ward Wolff is, and has been at all relevant times, a director of Sunesis. Individual Defendant Wolff signed the Proxy.

22.     The Individual Defendants referred to in ¶¶ 13-21 are collectively referred to herein as the "Individual Defendants" and with Sunesis they are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I.     Background and the Proposed Merger

23.     Sunesis is a biopharmaceutical company. The Company focuses on the development of targeted inhibitors for the treatment of hematologic and solid cancers. The Company's lead programs are Vecabrutinib, a selective non-covalent inhibitor of Bruton's Tyrosine Kinase (BTK) inhibitors is in Phase Ib/II clinical trial. The Company is also developing SNS-510, a phosphoinositide dependent protein kinase 1 (PDK1) inhibitor and TAK-580 is an

oral, investigative drug selective for pan-Raf kinase inhibition, in patients with relapsed or refractory solid tumors. The Company also offers Vosaroxin, an anticancer quinolone derivative (AQD), which is used for the treatment of acute myeloid leukemia (AML).

24.     Viracta is a clinical-stage, biomarker-directed precision oncology company focused on advancing new medicines for the treatment of virus-associated malignancies. The association of viruses and cancer has been well characterized, and Viracta's lead program is focused on cancers associated with the Epstein-Barr virus ("EBV"). EBV has been recognized as a Group 1 human carcinogen by the World Health Organization. Despite the association of EBV with cancer, attempts to develop vaccines have not proven successful. EBV enters periods of latency during which most viral genes are epigenetically suppressed, which allows an infected cell to not be killed by the virus should it enter a lytic replication cycle. Likewise, the latently infected cell can evade the body's immune surveillance mechanisms. In some stages of latency, no viral proteins are expressed on the cell surface, making it difficult to develop broadly effective immunotherapies. There are over 250,000 new cases of EBV-associated cancers each year with regard to lymphoma, nasopharyngeal carcinoma ("NPC") and gastric carcinoma ("GC"), and there are currently no approved therapies for these cancers, which are responsible for over 140,000 deaths each year. Viracta's novel synthetic lethality approach targets the EBV genome to enable the killing of the tumor cells by inducing the expression of certain viral kinase genes which in-turn activate an antiviral drug. The activated antiviral drug disrupts the DNA replication cycle of the target cells resulting in chain termination and killing of the tumor cells by inducing apoptosis, also known as programmed cell death. This synthetic lethality approach may also be applicable to other cancers associated with the herpes family of viruses, to which EBV belongs, such as glioblastoma associated with cytomegalovirus, Kaposi's sarcoma with Kapois's sarcoma virus, and

gastrointestinal carcinomas with Human Herpesvirus 6.

25.    On November 30, 2020, Sunesis and Viracta issued a joint press release announcing

the Proposed Merger, which states in relevant part:

### Sunesis Pharmaceuticals and Viracta Therapeutics Announce Definitive Merger Agreement

*Merger to create Nasdaq-listed company focused on developing Viracta's precision oncology pipeline targeting virus-associated malignancies*

*Registration trial for Viracta's lead program in Epstein-Barr virus (EBV)-positive lymphomas expected to begin in the first half of 2021*

*Leading institutional investors committed a total of $105 million in private financings with Viracta*

*Combined company expected to have approximately $120 million cash balance following the close of the merger*

*Companies to host conference call today at 8:30 AM Eastern Time*

SOUTH SAN FRANCISCO and SAN DIEGO, Calif., November 30, 2020 (GLOBE NEWSWIRE) — Sunesis Pharmaceuticals, Inc. (Nasdaq: SNSS) and Viracta Therapeutics, Inc., a privately held precision oncology company targeting virus-associated malignancies, today announced they have entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Viracta will combine with Sunesis in an all-stock transaction (the "Merger"). The merged company will focus on the advancement and expansion of Viracta's clinical stage, precision oncology pipeline targeting virus-associated malignancies, including Viracta's lead program for the treatment of Epstein-Barr virus (EBV)-positive relapsed/refractory lymphomas. Upon completion of the Merger, the combined company will operate under the name Viracta Therapeutics, Inc. and intends to be listed on the Nasdaq Global Market under the ticker symbol "VIRX."

Viracta recently completed a $40 million Series E Preferred Stock equity financing led by aMoon, Israel's leading healthtech and life sciences venture fund, with participation from Taiwania Capital Management, Latterell Venture Partners, LifeSci Venture Partners and other existing investors.

Concurrent with the execution of the Merger Agreement, Viracta entered into an agreement for the sale of common stock in a private placement with an investor syndicate of institutional accredited investors led by BVF Partners L.P., with participation from aMoon, Ridgeback Capital Management, Surveyor Capital (a Citadel company), Logos Capital, Samsara Biocapital, Sectoral Asset Management,

Janus Henderson Investors, LifeSci Venture Partners, and Serrado Capital LLC, as well as other institutional investors. The private placement is expected to result in gross proceeds to Viracta of approximately $65 million prior to the close of the Merger, subject to customary conditions. Upon the close of the Merger and related financing, the total cash balance of the combined company is expected to be approximately $120 million with an expected cash runway into 2024.

Viracta's lead program evaluates the all-oral combination of nanatinostat, its proprietary investigational drug, and valganciclovir in a Phase 2 clinical trial for the treatment of EBV-positive relapsed/refractory lymphomas. There are currently no approved therapies for EBV-associated cancers, which are responsible for over 140,000 deaths each year. Viracta's precision oncology and biomarker-driven combination product candidate targets EBV-positive cancer cells with an inducible synthetic lethality approach. Viracta plans to initiate a registration trial for the treatment of EBV-positive lymphoma in the first half of 2021, and also plans to initiate a Phase 1b/2 trial in EBV-positive solid tumors in 2021.

"This is a transformational event for Viracta, and I am very pleased to see the company brought forward into the public market," said Roger Pomerantz, M.D., F.A.C.P., Chairman of the Board of Directors of Viracta. "Importantly, Viracta's novel approach to targeting viral latency represents a completely new medical modality in the landscape of precision oncology, and today is the beginning of an important and exciting new phase in the company's evolution. EBV-induced malignancies are a high unmet medical need area, and the patients are waiting for novel therapies."

"After a thorough evaluation of strategic alternatives, the Board of Directors of Sunesis believes this merger is in the best interest of Sunesis' stockholders and has the potential to deliver near- and long-term value," said Dayton Misfeldt, Interim Chief Executive Officer of Sunesis. "This transaction will provide the resources for the combined company to leverage Viracta's scientific platform and pipeline to treat a range of virus-associated cancers and other serious diseases. Viracta shares our mission to develop important new targeted treatments for patients living with cancer, and we are enthusiastic about the prospect of carrying on that mission."

Ivor Royston, M.D., President and Chief Executive Officer of Viracta added, "The merger and our private financings represent a significant step in Viracta's growth as a late-stage development company. Our ongoing Phase 2 clinical trial for the treatment of EBV-positive lymphomas has produced encouraging efficacy and safety, and these transactions provide meaningful capital as we advance this program towards registration and expand our clinical pipeline. We look forward to building upon our clinical and corporate momentum to create shareholder and patient value, as we advance our important work to address the significant unmet needs in virus-associated malignancies."

**About the Merger**

Under the terms of the Merger Agreement, pending stockholder approval of the transaction, Viracta will merge with a wholly owned subsidiary of Sunesis, and stockholders of Viracta will receive shares of newly issued Sunesis common stock. Viracta stockholders are expected to own approximately 86% and Sunesis stockholders will own approximately 14% of the combined company on a fully diluted basis using the treasury stock method. The percentage of the combined company that Sunesis stockholders will own as of the close of the Merger may be subject to adjustment based on Sunesis' net cash.

The Merger Agreement has been unanimously approved by the Board of Directors of each company. The transaction is expected to close in the first quarter of 2021, subject to approvals by stockholders of each company and other customary closing conditions.

MTS Health Partners, L.P. is serving as the financial advisor to Sunesis, and Cooley LLP is serving as legal counsel to Sunesis. SVB Leerink LLC and Evercore Group LLC served as placement agents in Viracta's private financings. Wilson Sonsini Goodrich & Rosati is serving as legal counsel to Viracta.

**Management and Organization**

The combined company will be led by Viracta's current management team and will be headquartered in Cardiff, California. The Board of Directors is expected to consist of seven members, including six members from Viracta's board and one member from Sunesis' board.

**II.     The Proxy Omits Material Information**

26.     On January 13, 2021, Defendants filed the materially incomplete and misleading Proxy with the SEC.  The Individual Defendants had a duty to carefully review the Proxy before it was filed with the SEC and disseminated to Sunesis' shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for Sunesis' shareholders to make an informed decision in connection with the Proposed Merger.

A.     The Misleadingly Incomplete Financial Projections

27.     First, the Proxy entirely omits any of the financial projections for Sunesis and the

Viracta financial projections prepared by Viracta management (the "Omitted Projections").  The Proxy indicates that both of these sets of projections were provided to, reviewed, and relied upon by MTS in rendering their fairness opinion, and, thus, were readily available to be disclosed. However, the Proxy fails to disclose Omitted Projections or provide a reason such information is not disclosed.

28.     The Omitted Projections served as a primary reason for the Board and MTS to find the Merger Consideration "fair" to Sunesis shareholders. The Omitted Projections are plainly material and speak squarely to the question that the Company's shareholders must answer in determining whether to vote in favor of the Proposed Merger: is a smaller stake in the combined company more or less valuable than a full stake in the standalone company? Without the Omitted Projections, Defendants present the Company's shareholders with only a fraction of the equation, rendering them unable to answer this question and assess the fairness of the Proposed Merger. Thus, the Omitted Projections are plainly material to shareholders and must be disclosed.

29.     Second, the *Preliminary Analysis* omits the net income and unlevered free cash flow projections. As two of the most important metrics in valuing a company's future operations, these projections were needed for Sunesis shareholders to obtain an accurate picture of Viracta's value. Further, these projections were provided in the *Go-Forward Projections*, and thus are also required so that Sunesis shareholders can understand how these metrics changed from one set of projections to the next.  As currently disclosed, the *Preliminary Analysis* and *Go-Forward Projections* present a misleadingly incomplete summary of Viracta's valuation.

30.     Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a proxy statement discloses valuation information,

such information must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the valuation information relied upon by MTS and the Board but have failed to disclose the Omitted Projections and the net income and unlevered free cash flow projections of the *Preliminary Analysis*. These omissions render the summary of each entity's value and financial picture in the Proxy misleadingly incomplete.

B.      The Misleadingly Incomplete Summary of MTS' Valuation Analyses

31.     The Proxy describes MTS' fairness opinion and the various valuation analyses performed in support of their opinion. Defendants concede the materiality of this information by including MTS' fairness opinion and its valuation analyses among the "material" factors considered in recommending the Proposed Merger. However, the summary of MTS' fairness opinion and analyses provided in the Proxy fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Sunesis shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on MTS' fairness opinion in determining whether to vote in favor of the Proposed Merger. This omitted information, if disclosed, would significantly alter the total mix of information available to Sunesis' shareholders.

32.     In summarizing the *Discounted Cash Flow Analysis* prepared by MTS, the Proxy fails to disclose the following key information: (i) each publicly traded comparable company and its WACC used to determine the 11% to 13% discount rate range; (ii) the reason MTS used comparable WACC's instead of using Viracta's actual cost of capital; and (iii) the reason MTS

decided to not use a terminal value.

33.     These key inputs are material to shareholders, and their omission renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" Id.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

34.     Without the above-omitted information, Sunesis shareholders are misled as to the reasonableness or reliability of MTS' analysis, and unable to properly assess the fairness of the Proposed Merger.  As such, these material omissions render the summary of the *Discounted Cash Flow Analysis* included in the Proxy misleadingly incomplete.

C.     <u>The Misleadingly Incomplete Summary of the Background of the Merger</u>

35.     The Proxy contains a misleadingly incomplete summary of the events leading up

to the Proposed Merger that omits material facts. Once a company travels down the road of partial disclosure of the history leading up to a merger, they had an obligation to provide shareholders with an accurate, full, and fair characterization of those historic events. Even a non-material fact can trigger an obligation to disclose additional, otherwise non-material facts in order to prevent the initial disclosure from materially misleading the stockholders.

36.     First, the Proxy states that Sunesis will designate Individual Defendant Onetto to continue on as director of the combined company. Yet, the Proxy fails to disclose the timing and nature of the negotiations leading to this determination. Such information is important to shareholders because negotiating for continued employment and Board seats is a conflict of interest that could cause the Individual Defendants to value their own continued involvement in the Company over the value offered to shareholders. Accordingly, the omission and/or partial disclosure of this information renders the summary provided in the Proxy misleadingly incomplete.

37.     Second, the Proxy states that Individual Defendant Misfeldt tendered his resignation as both an officer and director of the Company after the signing of the Merger Agreement, but before the filing of the preliminary S-4 proxy statement. However, the Proxy fails to explain why Individual Defendant Misfeldt decided to resign. He could have simply stayed in his role through the closing of the Proposed Merger and exited the company along with the majority of the Company's directors. But instead, he felt the need for an immediate resignation prior to the dissemination of the initial proxy statement. The timing of the resignation raises questions that the Proxy fails to answer, rendering the statements about his resignation misleadingly incomplete.

38.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act and the Individual

Defendants' duty of candor/disclosure.  Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to make an informed decision regarding the Proposed Merger, and is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

### COUNT I
**Against All Defendants for Violations of Section 14(a) of the Exchange Act**

39.      Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

40.      Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

41.      Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

42.      The omission of information from a proxy will violate Section 14(a) if other SEC regulations specifically require disclosure of the omitted information.

43.      Defendants have issued the Proxy with the intention of soliciting Sunesis' common shareholders' support for the Proposed Merger.  Each of the Individual Defendants

reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for Sunesis and Viracta; (ii) MTS' valuation analyses performed in support of its fairness opinion; and (iii) the background of the Proposed Merger.

44.     In so doing, Defendants made misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated in or omitted from the Proxy, but failed to obtain and disclose such information to Sunesis' shareholders, though they could have done so without extraordinary effort.

45.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  As officers or directors of the Company and signatories to the Proxy, the Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve the Proposed Merger and solicit shareholder consent; indeed, the Proxy states that MTS reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by MTS, as well as their fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the financial projections and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified

above to be misleadingly incomplete.  Indeed, the Individual Defendants were required to review MTS' analyses in connection with their receipt of the fairness opinion, question MTS as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

46.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in: (i) their decision to omit material information from the Proxy; or (ii) their failure to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as Sunesis' officers and directors.

47.     Sunesis is also deemed negligent as a result of the Individual Defendants' negligence in preparing and/or reviewing the Proxy.

48.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to make an informed decision on the Proposed Merger if such misrepresentations and omissions are not corrected prior to the special meeting of Sunesis' shareholders.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

49.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50.     The Individual Defendants acted as controlling persons of Sunesis within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of Sunesis, and participation in and/or awareness of Sunesis' operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Sunesis, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

51.     Each of the Individual Defendants, as a signatory to the Proxy, was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Sunesis, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of the Board to approve the Proposed Merger.

53.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

54.     Thus, the Individual Defendants have violated § 20(a) of the Exchange Act.

55.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9

by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

56.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### COUNT III
**Against the Individual Defendants for Breach of Fiduciary Duty of Candor/Disclosure**

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     By virtue of their role as directors or officers of the Company, the Individual Defendants directly owed Plaintiff and all Company shareholders a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

59.     As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving or causing the materially deficient Proxy to be disseminated to Plaintiff and the Company's other public shareholders.

60.     The misrepresentations and omissions in the Proxy are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

61.     Plaintiff has no adequate remedy at law.  Only through the exercise of this

Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from consummating the Proposed Merger, until Defendants disclose the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 14, 2021

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
John Baylet (JB-6725)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
       jbaylet@monteverdelaw.com

*Attorneys for Plaintiff*